FELIPE SEGARRA SERRA, ETC., ET AL., demandantes y recurridos, *v.* CARMEN RIVERO VDA. DE LLORÉNS TORRES, ETC., ET AL., demandados-terceros demandantes y recurrentes; GABRIEL DE JESÚS LLORÉNS JIMÉNEZ, interventor-demandado y tercero demandante y recurrente, MONACILLOS INVESTMENT CORPORATION, ET AL., terceros demandados y recurridos; MIRANDA & EGUÍA, INC., tercera demandada y recurrida.

*Número:* R-68-107 · *Resuelto:* 30 de abril de 1970

*Héctor González Blanes* y *Luis R. Polo,* abogados de los recurrentes; *González, González, Jr., González Oliver & Novak,*

abogados de los recurridos; y *José Pérez Rodríguez,* abogado de Miranda & Eguía, Inc.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Este es un caso complicado tanto por la naturaleza como por la multiplicidad de sus alegaciones. El punto que ocupa nuestra atención, sin embargo, es claro y específico. Se trata del efecto de las anotaciones preventivas de demanda sobre un contrato de compraventa otorgado con anterioridad a la anotación pero no elevado a escritura pública, y, por consiguiente, no inscrito.

Es indispensable hacer un resumen de los hechos para una cabal comprensión del caso y de nuestra decisión.

Felipe Segarra y la Sucesión Lloréns Torres([1]) eran dueños por partes iguales de una finca de alrededor de 30 cuerdas ubicada en el Barrio Monacillos de Río Piedras. El 29 de noviembre de 1951 acordaron, mediante la escritura pública Núm. 176 otorgada ante el notario Enrique Córdova Díaz, la división física de esta propiedad en dos parcelas distintas de quince cuerdas cada una, adjudicándose a la recurrente Sucesión Lloréns la parcela "A" y la "B" al recurrido Felipe Segarra. Convinieron, además, las partes en dicha escritura que Felipe Segarra llevaría a cabo la urbanización de la parcela "A" aportando de su propio peculio todos los gastos del proyecto y repartiéndose los beneficios por mitad, luego de acreditar a la Sucesión Lloréns la cantidad de $45,000 por el valor de la parcela y los costos de urbanización a Segarra.([2]) La escritura Núm. 176 consta inscrita en el Registro de la Propiedad.

---

([1]) La Sucn. Lloréns Torres está compuesta por la viuda Carmen Rivero Rodríguez, fallecida después de radicada la demanda, y sus hijos Elio, José y Luis Lloréns Rivero y el interventor Gabriel de Jesús Lloréns Jiménez.

([2]) Tiempo después de haberse concertado el convenio la parcela "A" quedó congelada por un litigio que duró más de 12 años. Véase *Ramos Buist* v. *Sucn. Lloréns Torres,* 92 D.P.R. 451 (1965).

Con motivo del alegado rechazo del convenio de urbanización por la Sucn. Lloréns, radicó Felipe Segarra el 21 de julio de 1965 una demanda de cumplimiento específico de contrato en el presente caso. La Sucn. Lloréns admitió en su contestación a la demanda el otorgamiento de la escritura Núm. 176 pero negó su validez alegando vicios del consentimiento por medio de dolo, error, violencia e intimidación. Alegó, además, tres defensas especiales, seis reconvenciones y una demanda contra tercero(3) para traer al pleito a Monacillos Investment Corp., entidad incorporada por Felipe Segarra para la urbanización de la parcela "A" y a favor de la cual transfirió título de dominio sobre dicha parcela en el 1957, título que también consta inscrito en el Registro de la Propiedad. Simultáneamente con la radicación de su contestación el 7 de febrero de 1966, la Sucn. Lloréns solicitó del Registrador de la Propiedad de Río Piedras y de la Sección Tercera de San Juan la anotación de un aviso de demanda. Acudió Monacillos Investment Corp. sin dilación al tribunal de instancia en solicitud de Orden Para Mostrar Causa alegando, en lo aquí pertinente, que desde el mes de agosto de 1960 y abril del 1964 había convenido la venta a Miranda & Eguía, Inc., de dos solares a segregarse del proyecto de urbanización Monacillos Shopping Center,(4) estando lista para firmar las escrituras de compraventa desde el 7 de febrero de 1966, o sea, con anterioridad a la fecha de la anotación preventiva de la demanda, razón por la cual dicha anotación preventiva no podía afectar los derechos

---

(3)A los fines del caso no es necesario reseñar las numerosas y prolijas alegaciones de la contestación a la demanda.

(4)La venta de ambos solares se llevó a efecto mediante el otorgamiento por las partes de documentos que tienen idénticas condiciones, excepto que la venta convenida en agosto de 1960 fue mediante documento privado y ante testigos y la venta de 1964 fue mediante documento reconocido ante notario.

En ambos casos la compradora extendió cheque por $2,000 y $60,000 respectivamente como pronto pago a favor de Monacillos Investment Corp. los cuales fueron debidamente cobrados por ésta.

adquiridos por ésta, procediendo que se decretara, previa vista al efecto, que Monacillos Investment Corp. podía otorgar la escritura correspondiente libre de los efectos de la anotación.

Con posterioridad a esta Moción Para Mostrar Causa, la Sucn. Lloréns enmendó la demanda contra tercero para traer también al pleito a Miranda & Eguía, Inc. (5) En vista de esta nueva alegación, el tribunal de instancia determinó que no procedía entrar en los méritos de la Moción Para Mostrar Causa hasta tanto Miranda & Eguía, Inc., no contestara dicha demanda contra tercero.

A los fines de mantener los hechos claros, conviene señalar que, aunque Miranda & Eguía, Inc., se trae a este pleito como un tercero demandado, no puede considerársele propiamente como tal, pues no hay en la demanda contra tercero alegación alguna de responsabilidad por parte de ésta hacia la tercera demandante-recurrente Sucn. Lloréns para el caso de que ésta le fuera responsable a su vez al demandante Felipe Segarra. Más bien su posición en el caso es la de un interventor traído al pleito en forma poco usual. El propósito evidente de la Sucn. Lloréns al traerla al pleito mediante una demanda contra tercero fue que se dilucidaran en estos mismos procedimientos los efectos de la anotación del aviso de demanda sobre los derechos adquiridos por Miranda & Eguía, Inc., mediante los contratos de compraventa otorgados en el 1960 y 1964. Así surge de las propias alegaciones de la demanda contra tercero, en la cual se expresa que como Miranda & Eguía, Inc., podría resultar afectada en sus pretendidos derechos, se le incluye en el pleito para

---

(5) También se incluyó a Hormigonera, Inc., Metropolitan Builders, Inc., y Lederle Laboratories Company, los cuales también se alegaba que habían adquirido por compra solares en el proyecto de urbanización Monacillos Shopping Center. Con respecto a estas partes, el Tribunal declaró sin lugar la solicitud de sentencia sumaria y no están envueltas en la presente revisión.

que alegue lo que estime pertinente, todo ello en evitación de multiplicidad de acciones. Miranda & Eguía, Inc., no levantó objeción alguna a este procedimiento irregular, obviamente también por su interés en que se dilucidaran rápidamente sus derechos.

En su contestación a la demanda contra tercero, Miranda & Eguía, Inc., alegó que ella había adquirido de Monacillos Investment Corp. los solares en cuestión mediante contratos de compraventa otorgados el 13 de agosto de 1960 y el 3 de abril de 1964, de buena fe, sin que tuviera conocimiento de defecto alguno en el título de su vendedor y sin que surgiera del Registro de la Propiedad, ni de ninguna otra fuente, causa alguna de nulidad. Conjuntamente con su contestación radicó Miranda & Eguía, Inc., una solicitud de sentencia sumaria incorporando a la misma su contestación jurada así como varios documentos de los cuales surgía, efectivamente, que la compraventa de los solares en cuestión se había perfeccionado con anterioridad a la anotación de la demanda, que Miranda & Eguía, Inc., había pagado las cantidades de $2,000 y $60,000 como parte del precio de los respectivos solares, y, que también había incurrido en gastos sustanciales por concepto de planos para la construcción de facilidades físicas para su negocio en dichos solares. (⁶) Refutó la Sucn. Lloréns la Moción de Sentencia

---

(⁶) Se acompañó a la Moción de Sentencia Sumaria los siguientes documentos:

a) Copia de la escritura Núm. 15 de 21 de abril de 1947 ante el notario Arturo O'Neill, en la cual el demandado Elio Lloréns Rivero confiere poder a la codemandada Carmen Rivero Vda. de Lloréns para llevar a cabo la división y convenio de urbanización otorgado mediante la mencionada escritura 176.

b) Copia de la escritura Núm. 176 de 29 de nov. de 1951 otorgada por el demandante y los demandados ante el notario Enrique Córdova Díaz.

c) Copia de certificación registral con relación a la inscripción de dicha escritura.

d) Copias de los contratos de compraventa otorgados en agosto de 1960 y abril de 1964.

Sumaria basándose en que no obstante alegar Monacillos Investment Corp. que dichos solares dejaron de ser de su pertenencia, sin embargo, con posterioridad a la anotación de la demanda ella sometió un Nuevo Plano de Inscripción Parcial Enmendado a la Junta de Planificación alegando en la solicitud que dichos solares eran de su propiedad, y, que los contratos de compraventa otorgados en agosto de 1960 y abril de 1964 carecían de toda validez porque fueron otorgados en violación a la Ley y del Reglamento de Planificación de Puerto Rico porque no se había obtenido previamente la autorización de la Junta de Planificación para la segregación de dichos solares.

El tribunal de instancia dictó sentencia sumaria parcial concluyendo que la anotación preventiva de demanda no afecta derechos adquiridos mediante un contrato de compraventa perfeccionado de acuerdo con la ley con anterioridad a la anotación, aunque el mismo no haya sido inscrito, ni se haya elevado a escritura pública. En su consecuencia, declaró que el título de Miranda & Eguía, Inc., sobre los solares en cuestión no estaba sujeto a la anotación del aviso de demanda y ordenó que se procediera a otorgar las correspondientes escrituras de venta.

Posteriormente, a petición de la Sucn. Lloréns Torres el tribunal de instancia formuló conclusiones de hecho adicionales al efecto de que Monacillos Investment Corp. era una corporación integrada exclusivamente por el demandante Felipe Segarra y sus hijos Mildred y Luis Felipe Segarra Boerman; que a la fecha de la anotación de demanda no se

---

e) Copia del cheque Núm. 3347 de 8 de agosto de 1960 librado por Miranda & Eguía, Inc., a favor de Monacillos Investment Corp. y copia del cheque Núm. 2173 de 3 de abril de 1964 librado por Miranda & Eguía a favor de Monacillos Investment Corp.

f) La solicitud de Orden Para Mostrar Causa jurada por Felipe Segarra.

g) Declaración jurada de Pablo Eguía Dávila, Presidente de Miranda & Eguía, Inc.

había presentado ni inscrito en el Registro las ventas a favor de Miranda & Eguía, Inc. También concluyó que a pesar de que al otorgarse los contratos de venta a Miranda & Eguía, Inc., las lotificaciones de los solares no habían sido aprobadas por la Junta de Planificación, esto se hizo constar en los referidos contratos y se condicionaron los mismos a que el vendedor cumpliera con las exigencias de la Junta y que además, el Plano de Inscripción Parcial de los solares vendidos a Miranda & Eguía, Inc., fue aprobado por Resolución de la Junta el día 17 de junio de 1964, o sea, antes de radicarse la demanda y de anotarse el aviso de demanda.

Contra esta sentencia interpuso oportunamente la Sucn. Lloréns recurso de revisión apuntando la comisión de varios errores. [7] En vista de que la recurrente no discute sus apuntamientos separadamente, sino que entremezcla sus argu-

---

[7] En resumen los errores señalados se contraen a:

a) a demostrar que Miranda & Eguía, Inc., no puede gozar del carácter de un tercero hipotecario por no tener el beneficio de un título inscrito,

b) que no teniendo tal carácter, los derechos que adquirió de Monacillos Investment Corp., en virtud de los contratos de compraventa otorgados en 1960 y 1964, quedaron sujetos a las resultancias del litigio, a tenor con la anotación del aviso de demanda,

c) que erró el tribunal al ordenar el levantamiento del *lis pendens*, por cuanto los solares no habían sido aún segregados ni vendidos mediante escritura pública, no siendo suficiente para la trasmisión del dominio los contratos privados otorgados en 1960 y 1964,

d) que la sentencia sumaria violó los Arts. 33 y 34 de la Ley Hipotecaria,

e) que el tribunal de instancia incidió al concluir que Monacillos Investment Corp. había traspasado los mencionados solares al recurrido Miranda & Eguía, Inc., ya que con posterioridad a la anotación de demanda ella sometió un Nuevo Plan de Inscripción Parcial Enmendado ante la Junta de Planificación alegando en la solicitud que dichos solares eran de su propiedad,

f) que los alegados traspasos a Miranda & Eguía, Inc., son nulos porque no se obtuvo previamente la aprobación de la Junta de Planificación para la segregación de los solares, y

g) que el tribunal de instancia incidió al dictar sentencia sumaria habiendo una controversia sin resolver que requiere juicio plenario.

mentos en una discusión global de su caso, consideraremos solamente aquellas cuestiones fundamentales que surgen de su alegato, a saber: a) efectos de la anotación preventiva de demanda sobre los derechos adquiridos por Miranda & Eguía, Inc., en virtud de los contratos de compraventa otorgados en 1960 y 1964, lo que a su vez depende de, b) la naturaleza y alcance de esos derechos, específicamente, si en virtud de los contratos y otros hechos pertinentes se llegó a verificar un acto traslativo del dominio, c) nulidad de los contratos fundada en que no se obtuvo previamente la aprobación de la Junta de Planificación para la segregación de los solares.

—I—

### Efectos de la Anotación Preventiva

Conviene aclarar desde el principio de la discusión que no está envuelto propiamente en este recurso un problema de tercero registral. Ni la sentencia cuya revisión nos ocupa confiere tal carácter a Miranda & Eguía, Inc., ni éste pretende abroquelarse bajo tal condición, por lo menos, en esta etapa de la litigación en que todavía no tiene a su favor un título inscrito, que, como se sabe, es requisito indispensable para ser considerado tercero hipotecario. Artículo 34, Ley Hipotecaria, 30 L.P.R.A. sec. 59; *Olmedo* v. *Balbín*, 69 D.P.R. 588 (1949). Hacemos esta aclaración porque la recurrente dedica una parte sustancial de su alegato a esta cuestión.

■ La anotación preventiva de demanda, bien sea bajo el Art. 91 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 455, o bajo el Art. 42 de la Ley Hipotecaria, 30 L.P.R.A. sec. 91([8])—la diferencia entre ambas disposiciones es más

---

([8]) El Art. 91 del Código de Enjuiciamiento Civil provee:

"Cuando en una acción que afecte al título o al derecho de posesión de una propiedad inmueble, el demandante al tiempo de presentar la demanda, y el demandado al tiempo de presentar la contestación o en cualquier tiempo después, pidieren se declare que lo que se reclama es suyo, podrán presentar para su anotación al registrador del distrito en que

bien de forma que de fondo, *Hernández* v. *Registrador*, 67
D.P.R. 452 (1947) (⁹)—tiene el propósito de preservar el de-
bido respeto a la administración de justicia evitando que resul-
ten inoficiosas las sentencias judiciales por actos del deman-
dado que impidan la ejecución de un fallo. No da ni quita de-
rechos. Sólo lleva al Registro la existencia de un pleito que
puede poner en riesgo los títulos inscritos. Su virtud con-
siste, pues, en dar a conocer a *futuros* adquirentes la exis-
tencia de un litigio cuyo resultado puede ser lesivo a sus
intereses. Es una simple advertencia que previene a los
adquirentes *posteriores* de posibles causas de nulidad de los
títulos inscritos, de manera que luego no puedan alegar des-
conocimiento de esas causas de nulidad. (¹⁰) Al efecto, nos

---

radicare la propiedad o parte de ella un aviso de la cuestión litigiosa
pendiente, el cual contendrá los nombres y apellidos de las partes, el objeto
de la demanda o contestación, y la descripción de la propiedad en litigio.
Sólo desde el día de la presentación del aviso para ser anotado se
considerará que el comprador o la persona que adquiera un gravamen
sobre la propiedad litigiosa, tiene conocimiento, para los efectos legales,
de la acción pendiente contra las partes designadas por sus nombres
verdaderos."

El Art. 42 Ley Hipotecaria provee:

"Podrán pedir anotación preventiva de sus respectivos derechos en
el Registro público correspondiente:

1. El que demandare en juicio la propiedad de bienes inmuebles o la
constitución, declaración, modificación o extinción de cualquier derecho
real.

.    .    .    .    .    .    .    ."

(⁹) En *Hernández* v. *Registrador*, supra, aplicamos el procedimiento
provisto por el Art. 42 de la Ley Hipotecaria para hacer efectivo el
derecho que surge de la anotación de *lis pendens* bajo el Art. 91 del Código
de Enjuiciamiento Civil, lo cual significa que puede usarse indistinta-
mente ambas disposiciones para los mismos propósitos.

(¹⁰) Sobre la naturaleza y alcance de la anotación preventiva de
demanda puede verse, entre otros: Roca Sastre, III *Derecho Hipotecario*,
capítulo XLVI, pág. 402 y sig., Galindo y Escosura, II *Comentarios a la
Legislación Hipotecaria*, pág. 482 y sig. (1903); Gómez de la Serna, II *La
Ley Hipotecaria*, pág. 1; Campuzano, II *Principios Generales de Derecho
Inmobiliario*, págs. 15 y sig. (Segunda Ed. 1941); Muñoz Morales, I *Lec-
ciones de Derecho Hipotecario*, Lección 19, pág. 281 (1945); Capo Bonna-
fous, *Apuntes Sobre las Anotaciones Preventivas* . . . IX Rev. Crítica de
Derecho Inmobiliario, pág. 282 (1933).

dice Roca Sastre a la página 413 del tomo tercero de su obra *Derecho Hipotecario:*

"Constituyen simples medidas de seguridad, con *vista a futuros* adquirentes; reservas registrales o defensas contra el Registro, a fin de evitar una actividad fraudulenta posterior. Examínense la mayoría de estas anotaciones y en ellas se verá que la preocupación del legislador al establecerlas, fue la de evitar que el demandado, el transferente de un título defectuoso, etc., defraude con enajenaciones o gravámenes las legítimas esperanzas de los favorecidos por la anotación. Estas anotaciones, por tanto, tienen por objeto conservar inmutables las condiciones de cumplimiento o de efectividad de un derecho, existentes al tiempo de practicarse las mismas." (Bastardillas nuestras.)

Como lo que se anota es la existencia de un pleito, mientras no haya pleito pendiente no puede haber anotación. Así el citado Art. 91 dispone: ". . . el demandante al tiempo de presentar la demanda, y el demandado al tiempo de presentar la contestación o en cualquier tiempo después . . . podrán presentar para su anotación . . . un aviso de la cuestión litigiosa *pendiente. . . .*"

En consecuencia, la anotación sólo habrá de perjudicar desde que se presenta en el Registro, que es cuando propiamente se da publicidad al hecho del litigio. Al efecto dice el Art. 91: "Sólo desde la presentación del aviso para ser anotado se considerará que el comprador . . . tiene conocimiento, para los efectos legales, de la acción pendiente. . . ."

Es por virtud de esa publicidad que la anotación perjudica a los adquirentes posteriores. No es otra cosa que los efectos comunes y corrientes de la publicidad registral: perjudicar a *futuros* adquirentes. No perjudica a los adquirentes *anteriores*, aunque sus títulos, como en el caso de autos, no hayan sido inscritos. Por supuesto, a menos que conste claramente del registro algún vicio o causa de nulidad de la titularidad inscrita, Art. 34 Ley Hipotecaria, pero ya sería, no por efecto de la anotación preventiva, sino por la publicidad

del vicio que aparece en el Registro con anterioridad a la anotación. Ello es así porque el efecto propio de la anotación es preservar el status quo de la propiedad al momento de radicarse la demanda, y, si a ese momento ya la propiedad ha sido enajenada, o sea, se ha verificado un acto traslativo del dominio, la anotación no puede afectarla. La preferencia o rango de la anotación se limita, pues, a los adquirentes posteriores, salvo casos excepcionales.

Este es fundamentalmente el criterio sostenido por la generalidad de los autores. Morell, III *Comentarios a la Legislación Hipotecaria* 322, Barrachina, *Derecho Hipotecario*, II pág. 37, Roca Sastre, III *Derecho Hipotecario* 441, Martínez Escobar, II *Las Inscripciones*, pág. 197. Contra, parcialmente, Faced Gress, *La Anotación Preventiva de Demanda, Su Valor Jurídico*, XX Revista Crítica de Derecho Inmobiliario 77.

Al efecto nos dice Barrachina con gran fuerza persuasiva:

"De no ser así, el que tratase de comprar una finca, tendría que enterarse por todos los Juzgados de España si había pendiente pleito de propiedad sobre la misma, con lo cual, cernida la incertidumbre y bajo la amenaza del despojo de los intereses fundados en la buena fe, sería de todo punto imposible, absolutamente imposible la contratación, y sin objeto la institución registral, barrenada de este modo en sus fundamentos."

Roca Sastre, al formular un criterio orientador sobre esta cuestión, niega rango preferente a la anotación preventiva de demanda con respecto a los actos dispositivos o títulos otorgados con anterioridad a la anotación, con excepción de los casos de rectificación de inexactitudes registrales en que prevalece siempre la anotación de demanda. *Op. cit.* 441. [11]

---

[11] La rectificación de inexactitudes registrales se refiere generalmente a errores subsanables que pueden aparecer de los títulos que obran en los Registros o de las inscripciones principales. Véase *Enciclopedia Jurídica Española,* Tomo 26, pág. 686.

Salvo estos casos de rectificación de asientos, en todos los demás, apunta Roca Sastre, los "actos o títulos anteriores prevalecen sobre la anotación de demanda y pueden originar incluso la cancelación de ésta." Id.

■ En resumen, resolvemos que la anotación preventiva de demanda no afecta las enajenaciones verificadas con anterioridad a la presentación de la anotación en el Registro, aunque dichas enajenaciones no hayan sido inscritas.

No está de más anotar que en varias jurisdicciones de los Estados Unidos se ha llegado a una conclusión similar a la que aquí adoptamos, *Lee* v. *Silva*, 240 Pac. 1015 (Cal. 1925); *Oil Fields Corp.* v. *Dashko*, 294 S.W. 25 (Ark. 1927, *cert. denegado* 275 U.S. 548); *Bateman* v. *Bachus*, 34 N.W. 66 (Dak. 1887). Meramente señalamos la coincidencia sin entrar en un análisis de las decisiones, porque en esas jurisdicciones no existe un sistema hipotecario como el nuestro y las reglas que gobiernan la institución de la propiedad son, en muchos aspectos, distintas a las que establece nuestro Código Civil.

—II—

*Naturaleza y Alcance de la Transacción Realizada por Monacillos Investment Corp. y Miranda & Eguía, Inc., bajo los Contratos de Compraventa Otorgados en 1960 y 1964*

Debemos ahora precisar a la luz del derecho aplicable la naturaleza y alcance de la transacción realizada por Monacillos Investment Corp. y Miranda & Eguía, Inc., bajo los contratos en cuestión para poder determinar si en virtud de los mismos y de las circunstancias del caso, llegó a verificarse la trasmisión del dominio, en cuyo caso la anotación preventiva no podría perjudicarla.

Es sabido que el contrato de compraventa sólo genera derechos obligacionales entre las partes. En virtud del mismo,

se impone al vendedor la obligación de entregar la cosa objeto del contrato y al comprador la obligación de pagar el precio, pudiendo ambos compelerse mutuamente al cumplimiento de sus respectivas prestaciones. Artículo 1334 Código Civil, 31 L.P.R.A. sec. 3741; ([12]) *Varcárcel* v. *Sancho Bonet*, 61 D.P.R. 213 (1942) ; *Benítez Flores* v. *Llompart*, 50 D.P.R. 670 (1936) ; *Vélez* v. *Camacho*, 8 D.P.R. 37 (1905).

■ El contrato de compraventa por sí solo no transfiere el dominio sobre la cosa vendida. Nuestro ordenamiento jurídico requiere para la transferencia del dominio sobre la cosa vendida no sólo el acuerdo de voluntades sobre la cosa y el precio—perfeccionamiento del contrato, Art. 1339 Código Civil, ([13])—sino, además, la tradición o entrega de la cosa. Así, el Art. 549 del Código Civil, 31 L.P.R.A. sec. 1931, preceptúa que: "La propiedad y los demás derechos reales sobre los bienes se *adquieren y trasmiten por . . . consecuencia de ciertos contratos mediante la tradición.*" (Bastardillas nuestras.) El Art. 1048 del Código Civil puntualiza los efectos jurídicos de ambos requisitos—perfeccionamiento del contrato y tradición—al disponer que:

"El acreedor tiene derecho a los frutos de la cosa desde que nace la obligación de entregarla. Sin embargo, no adquiere derecho real sobre ella hasta que le haya sido entregada." 31 L.P.R.A. sec. 3012.

La tradición o entrega es propiamente bajo el Código Civil el modo de trasmitir el dominio y los demás derechos reales sobre las cosas objetos de contratación. Los Arts. 1351 a 1353 del Código Civil, 31 L.P.R.A. secs. 3811–3813, esta-

---

([12]) El Art. 1334 dispone:

"Por el contrato de compra y venta uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente."

([13]) El Art. 1339 dispone:

"La venta se perfeccionará entre comprador y vendedor, y será obligatoria para ambos, si hubieren convenido en la cosa objeto del contrato, y en el precio, aunque ni la una ni el otro se hayan entregado."

blecen varios modos de tradición, recogiendo, en términos generales, las diversas formas reconocidas en el derecho romano. (¹⁴) Dichos artículos disponen:

Artículo 1351:

"Se entenderá entregada la cosa vendida cuando se ponga en poder y posesión del comprador.

"Cuando se haga la venta mediante escritura pública, el otorgamiento de ésta equivaldría a la entrega de la cosa objeto del contrato, si de la misma escritura no resultare o se dedujere claramente lo contrario."

Artículo 1352:

"Fuera de los casos que expresa la sección precedente, la entrega de los bienes muebles se efectuará: por la entrega de las llaves del lugar o sitio donde se hallan almacenados o guardados; y por el solo acuerdo o conformidad de los contratantes, si la cosa vendida no puede trasladarse a poder del comprador en el instante de la venta, o si éste la tenía ya en su poder por algún otro motivo."

---

(¹⁴) El derecho romano reconocía múltiples formas de tradición, muchas de las cuales aún subsisten en los mencionados Arts. 1351 a 1353 del Código Civil. Generalmente la tradición se dividía en dos clases, la verdadera o real y la fingida (*traditio ficta*). La tradición real consistía en la entrega material de la cosa, si se trataba de un mueble, o en la ejecución de ciertos actos si se trataba de un inmueble. La tradición fingida comprendía la llamada simbólica, en virtud de la cual la entrega se efectuada mediante el empleo de signos o símbolos, como la entrega de las llaves, o el otorgamiento de escrituras, reconocida ésta también como tradición instrumental y, las denominadas *traditio longa manu*, que opera señalándose la finca a la vista del adquirente, la *traditio brevi manu*, que opera cuando el que compra tiene ya la cosa en su poder en virtud de otro título, la *constitutum possessorium*, que tiene lugar cuando el vendedor entra a poseer la propiedad en otro concepto, como arrendatario, y la cuasi tradición que se aplica a las cosas o derechos incorporales. Véanse: Puig Brutau, III *Fundamentos de Derecho Civil,* pág. 193; Castán, II *Comentarios Derecho Civil Español, Común y Foral,* págs. 179 y siguientes; Manresa, X *Comentarios al Código Civil Español,* págs. 154 *et seq.*; Puig Peña, *Compendio de Derecho Civil Español,* Tomo II, Vol. 1, pág. 219; Sánchez Román, III *Estudios de Derecho Civil,* Tomo III, pág. 250; Guaroa Velázquez, *Derechos Reales Principales,* págs. 332 *et seq.*

Artículo 1353:

"Respecto de los bienes incorporales, regirá lo dispuesto en el párrafo segundo de la sec. 3811 de este título. En cualquier otro caso en que ésta no tenga aplicación, se entenderá por entrega el hecho de poner en poder del comprador los títulos de pertenencia, o el uso que haga de su derecho el mismo comprador, consintiéndolo el vendedor."

■ La relación de las distintas formas de entrega contenida en los anteriores artículos no es de carácter limitativo. La entrega puede realizarse mediante otras formas o maneras, de acuerdo con la naturaleza de la cosa vendida y las circunstancias del contrato. Manresa, *supra*, a la página 157, Castán, *supra*, a la página 229, Velázquez, *supra*, a la página 336. Al efecto, afirma Castán que el Código Civil prescinde de los tecnicismos del derecho romano, sin renunciar a enumerar los modos de realizar la entrega en los artículos citados, equivalentes a los Arts. 1462, 1463 y 1464 del Código Civil Español, "a pesar de ser éstos variables hasta el infinito. . . ." *op. cit.*, *supra*, a las páginas 228–229.

Manresa se plantea específicamente el punto comentando:

"¿Tiene esa enumeración un carácter limitativo, de suerte que no será posible estimar que hay entrega de la cosa sino cuando ésta se haga de alguno de los modos que establecen los artículos que comentamos? Entendemos que no. De igual manera que alguno de estos modos puede no constituir entrega cuando se demuestre que no ha habido intención de entregar, siempre que se dé algún acto no comprendido en los artículos a que nos referimos, pero que vaya acompañado del evidente propósito por parte del vendedor de entregar y del comprador de recibir, la tradición debe entenderse verificada en virtud de ese solo acto. Si el elemento voluntad es esencial, lo que hay que probar es que ésta existió, sea de un modo, sea de otro." Manresa, *op cit.*, a la página 158, *Comentarios al Código Civil Español*.

Ante la variedad inagotable de modos de tradición es forzoso considerar los elementos esenciales de la entrega para

que reconociéndolos, podamos determinar su operación en casos específicos.

El Art. 1351, *supra*, establece la pauta para la entrega estableciendo que se entenderá hecha cuando se ponga la cosa vendida en *poder* y *posesión* del comprador.([15]) Se refiere este artículo al transferimiento de la posesión jurídica que no necesariamente supone la trasmisión de la detentación material de la cosa vendida. Castán, *op. cit.*, tomo IV, página 334, Puig Brutau, *supra*, a la página 183. No implica tampoco una trasmisión de la posesión de hecho, pues, puede verificarse, según vimos anteriormente, en forma simbólica: otorgamientos de títulos o entrega de llaves. Artículos 1351 y 1352, *supra*. Recuérdese, al respecto, la *traditio longa manu* en la que meramente se señala la finca al adquirente, o, la *traditio constitutum possessorium*, que opera cuando el vendedor sigue detentando la posesión material en virtud de un arrendamiento, o sea, ejercitando la posesión de hecho. Véase escolio 14. Como bien apunta Puig Brutau, no se trata de una realidad *física*, sino de un *concepto*. *Op. cit.* 184.

█ La tradición como concepto jurídico consiste en poner a disposición del comprador la cosa para que éste pueda ejercitar sobre ella el dominio. Los autores enumeran los siguientes requisitos: a) que el que trasmite sea dueño de la cosa, b) la existencia de justa causa para la trasmisión, c) la voluntad de trasmitir y de adquirir en el trasmitente y en el adquirente, d) capacidad de éstos para trasmitir y adquirir,

---

([15]) El uso de estos conceptos de poder y posesión ha sido motivo de amplia controversia. Algunos autores asimilan el concepto *poder* al dominio. Puig Peña, *op cit.*, pág. 219. Castán entiende ambos conceptos en un sentido unitario "sin que puedan separarse en la compraventa como actos a momentos distintos, la trasmisión de la posesión y la transferencia del dominio." Castán, *op cit.*, tomo IV, pág. 88. Otros interpretan que el concepto *poder* es utilizado en el contexto del Art. 1351 para reforzar el concepto de posesión, a manera de redundancia. Véase Moreno Mocholi, *¿Es Esencial a la Compraventa la Obligación de Trasmitir el Dominio?* 18 Rev. Crítica Derecho Inmobiliario, 377, 387.

y e) acto material o simbólico que la exteriorice. Véanse Sánchez Román, *op cit.*, págs. 245, 246; Castán, *op cit.*, tomo 2, pág. 222; Puig Peña, *op cit.*, págs. 218, 219.

En el caso de autos, el récord demuestra que:

a) La trasmitente Monacillos Investment Corp. era dueña de los solares en cuestión, habiendo adquirido títulos sobre los mismos en virtud de la escritura Núm. 24 de 9 de abril de 1957, ante el notario Iván Díaz de Aldrey, título que consta inscrito al folio 10 vto. del tomo 371 de Monacillos, Registro de la Propiedad de Río Piedras, finca Núm. 14075.

b) La justa causa para la trasmisión del dominio a Miranda & Eguía, Inc., aparece en los propios contratos de compraventa. En el contrato otorgado en el 1960 se acordó un precio de $35 el metro cuadrado, habiéndose entregado por Miranda & Eguía, Inc., en el acto de la firma del contrato la cantidad de $2,000 como parte del precio. Igualmente, en el contrato otorgado en el 1964 se acordó un precio de $40 el metro cuadrado, habiéndose entregado por Miranda & Eguía, Inc., la cantidad de $60,000 como parte del precio.

c) La voluntad de trasmitir y de adquirir aparece expresada con toda claridad de los términos de los contratos. En ambos se dispone expresamente que:

"La corporación Monacillos Investment Corp. vende, cede, y traspasa a la corporación Miranda & Eguía, Inc., el solar descrito en el párrafo primero de este contrato, *teniendo derecho la adquirente a la posesión del mismo desde esta fecha en adelante.*" (Bastardillas nuestras.)

En cuanto a este requisito sobre la voluntad de trasmitir y adquirir, basta para que se entienda realizada la entrega el acuerdo expreso entre las partes. Al efecto, dice Manresa, *op. cit.*, pág. 157:

"El Código, en los artículos que comentamos, ha ido enumerando las distintas maneras cómo la cosa puede ser entregada. En todas ellas se puede apreciar que lo que da vida legal al acto de la entrega es esencialmente la determinación de la

voluntad de las partes de entregar y de recibir respectivamente. Cuando la cosa se pone en poder y posesión del comprador; cuando se emplea un símbolo cuyo normal y ordinario simbolismo consiste en suponer la entrega; cuando hay *un acuerdo expreso sobre este punto,* o cuando, sabiendo el valor que la ley da al otorgamiento de la escritura, es ésta otorgada sin salvedades ni restricciones, hay que entender que ha habido voluntad de entregar y que la cosa ha sido entregada. Trátase al cabo de la interpretación de un acto que presupone una determinada posición de la voluntad." (Bastardillas nuestras.)

En el caso de autos no sólo hubo el acuerdo expreso sino que, además, en virtud del mismo, Miranda & Eguía, Inc., ha invertido cantidades sustanciales de dinero en estudios y planos para la construcción de facilidades físicas en dichos terrenos, lo que demuestra fuera de toda duda su voluntad de adquirir. *Cf. Ferry* v. *Alomar,* 15 D.P.R. 752 (1909).

d) No se ha cuestionado la capacidad de Monacillos Investment Corp. para trasmitir ni la de Miranda & Eguía, Inc., para adquirir.

■ e) El otorgamiento por escrito de ambos contratos constituye el acto simbólico que exterioriza la entrega. Aunque el Art. 1351 se refiere únicamente al otorgamiento de la escritura pública, sin embargo, sabemos que tal disposición no tiene carácter limitativo, no impidiendo, por lo tanto, otras formas de tradición, como la del presente caso, en que se cumple a cabalidad con los requisitos que hemos mencionado anteriormente.

Limitar la entrega exclusivamente al otorgamiento de escritura pública como equivalente de la entrega, sería una fútil aplicación mecánica del Art. 1351 que no responde a las exigencias de nuestro continuo desarrollo social y económico. Lo esencial es que se cumpla, como se ha cumplido en este caso, con los requisitos de la tradición. Una vez que las partes han acordado la entrega por justa causa—el pago de $2,000 en un caso y $60,000 en otro—y que, más todavía, el adquirente ha llevado a cabo actos que demuestran clara-

mente su voluntad de adquirir, teniendo las partes capacidad para trasmitir y adquirir, es forzoso concluir que se ha verificado una traslación del dominio. Lo contrario equivaldría a convertir la escritura en misteriosa piedra de toque, divorciada de toda realidad, en perjuicio de la certeza y seguridad del tráfico inmobiliario.

En vista de lo anterior, resolvemos que en virtud de los contratos otorgados por Monacillos Investment Corp. y Miranda & Eguía, Inc., en el 1960 y 1964 y de la forma de entrega comprendida en los mismos, se efectuó, con todas las consecuencias de ley, una trasmisión del dominio sobre los solares en cuestión del patrimonio de Monacillos Investment Corp. al patrimonio de Miranda & Eguía, Inc. Habiéndose, pues, transferido el dominio sobre dichos solares con anterioridad a la anotación preventiva de demanda, tal anotación no puede perjudicar en forma alguna la transmisión dominical.

—III—

*Nulidad de los Contratos por no Haberse Obtenido*
*Previamente la Aprobación de la Junta*
*de Planificación para la Segregación*
*de los Solares*

El Art. 24 de la Ley de Planificación, 23 L.P.R.A. sec. 25, dispone que carecerá de eficacia cualquier otorgamiento de escritura pública o contrato privado de lotificación si la Junta de Planificación de Puerto Rico no ha aprobado previamente dicha lotificación.

El tribunal de instancia concluyó que a pesar de que al otorgarse los contratos de venta a Miranda & Eguía, Inc., las lotificaciones de los solares no habían sido aprobadas por la Junta de Planificación, esto se hizo constar en los referidos contratos y se condicionaron los mismos a que el vendedor cumpliera con las exigencias de la Junta de Planificación, y,

además, que el Plano de Inscripción Parcial de los solares vendidos a Miranda & Eguía, Inc., fue aprobado por resolución de la Junta de Planificación el día 17 de junio de 1964, o sea, antes de radicarse la demanda y de anotarse el *lis pendens*. El récord sostiene ampliamente esta conclusión. Del mismo se desprende que la Junta de Planificación aprobó el desarrollo preliminar de lotificación mediante el Informe L-2000, caso Núm. 59-1294 lot, el 21 de mayo de 1959. Esto es, más de un año antes de otorgarse el contrato de 1960 y cerca de cuatro años antes del contrato otorgado en el 1964. También aparece que la Junta de Planificación aprobó los planos de construcción, habiéndose, en efecto, construido la obra y aprobados finalmente los planos de inscripción parcial para la Urbanización Industrial Monacillos el 13 de mayo de 1964.

Recientemente resolvimos en *Meléndez* v. *Jiménez Realty, Inc.*, 98 D.P.R. 892, opinión de 25 de marzo de 1970, que no contraviene el Art. 24 de la Ley de Planificación un contrato de compraventa que por sus propios términos está sujeto a que la Junta de Planificación apruebe la segregación.

No tiene importancia ni en forma alguna afecta la titularidad de Miranda & Eguía, Inc., sobre dichos solares el hecho de que en el informe de 14 de marzo de 1964 aprobando una enmienda al Plano de Inscripción Parcial, la Junta de Planificación expresara que Monacillos Investment Corp. compareció a solicitar dicha enmienda como dueña de los mismos. Como bien señala en su alegato la recurrida, es práctica de conocimiento general que las personas que inician como dueños las solicitudes de aprobación de proyectos ante la Junta de Planificación continúan apareciendo como tales hasta la terminación del caso y todos los trámites se continúan a su nombre.

*Se confirma la sentencia sumaria dictada por el tribunal de instancia en este caso y se devolverán los autos para procedimientos ulteriores compatibles con esta opinión.*

El Juez Presidente, Señor Negrón Fernández, no intervino; así como los Jueces Asociados Señores Blanco Lugo y Dávila.